**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **GREAT WEST CASUALTY CO.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:07-CV-1002** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **WAYNE FLANDRICH DBA J&W** | : | **Magistrate Judge Abel** |
| **TRANSPORT, et al.** | : | |
| | : | |
| **Defendants.** | : | |

<u>**OPINION AND ORDER**</u>

## I. INTRODUCTION

This matter comes before the Court on: (1) Plaintiff Great West Casualty Company's ("Great West") Motion for Partial Summary Judgment on the Carmack Amendment claim and/or breach of contract claim and attorney's fees request against Defendant/Third Party Plaintiff Wayne Flandrich ("Flandrich") dba J&W Transport ("J&W Transport") (doc. no. 30); (2) Flandrich's Motion for Summary Judgment against Great West on the Carmack Amendment claim (doc. no. 32); (3) Flandrich's Motion for Summary Judgment against Third-Party Defendants Risk Retention Group, Inc., Commercial Truck Claims Management, and Owner-Operator Services, Inc. (collectively referred to as "OOIDA") on the coverage claim (doc. no. 33); (4) OOIDA's Motion for Summary Judgment against Flandrich on the coverage claim and breach of duty to defend claim (doc. no. 31); and (5) Flandrich's Motion for Summary Judgment against Third Party Defendant OOIDA on the bad faith claim (doc. no. 38). For the reasons set forth below, this Court: (1) **GRANTS** Great West's Motion against Flandrich on the Carmack Amendment claim, but **DENIES** Great West's Motion against Flandrich on the breach of contract claim and request for attorney's fees; (2) **DENIES** Flandrich's Motion against Great

West on the Carmack Amendment claim; (3) **DENIES** Flandrich's Motion against OOIDA on the coverage claim; (4) **DENIES** OOIDA's Motion against Flandrich on the coverage claim, but **GRANTS** OOIDA's Motion against Flandrich on the breach of duty to defend claim; and (5) **DENIES** Flandrich's Motion against OOIDA on the bad faith claim.

## II. BACKGROUND

### A. FACTUAL BACKGROUND

#### 1. The Parties

Great West is a corporation in the insurance business. Great West provided a policy of insurance coverage to American Food Groups ("American Foods"), a Minnesota based corporation. J&W Transport is a dba of Flandrich, and is a trucking business based in Georgia. OOIDA is Flandrich's insurance coverage provider and provides him with a Commercial Inland Marine Motor Truck Cargo Liability policy.

#### 2. Transportation Agreement

On December 17, 2003, American Foods and J&W Transport entered into a transportation agreement (the "Transportation Agreement"), whereby J&W Transport would transport goods for American Foods. The Transportation Agreement establishes that "Carrier [J&W Transport] shall be responsible for all claims for loss, damage, injury, or delay." (Transportation Agreement at § 3). Liability for losses commences when J&W Transport signs the relevant bill of lading and receives the goods for transport. (*Id*.)

The Transportation Agreement also contains an indemnification clause, which establishes that J&W Transport will indemnify and hold American Foods harmless,

> from and against any and all loss, damages, cost, expense, including reasonable attorney's fees, which may be incurred by [American Foods] . . . resulting from

any acts, or omissions, negligent or otherwise, of [J&W Transport] or its
employees in performing or failing to perform the transportation services
specified hereunder . . . .

(Transportation Agreement at § 8).

## 3. Bills of Lading

On November 14, 2006, American Foods retained J&W Transport to pick up a load of

meat from American Foods. The load consisted of approximately 16,000 pounds of ground beef.

J&W Transport was to deliver the load to The Kroger Company ("Kroger") in Delaware, Ohio

and Meijer, Inc. ("Meijer") in Tipp City, Ohio [collectively referred to as "Buyers"].

In picking up the load, Flandrich, J&W Transport's driver of the load, signed bills of

lading ("Bills of Lading") attesting that the meat was in "apparent good order." Flandrich

testified that he had no reason to believe that the goods were damaged when they were

transferred into his possession from American Foods.

The Bills of Lading stated, "Buyer assumes all risk of loss upon Seller's delivery of the

goods to the carrier at the Shipping Point and Seller shall have no further responsibility for the

goods." (Bills of Lading at p. 2). In addition, the Bills of Lading stated that:

[i]t is mutually agreed, as to each carrier of all or any of said property over all or
any portion of said route to destination, and as to each party at any time interested
in all or any of said property, that every service to be performed hereunder shall
be subject to the terms and conditions of [this] Uniform Domestic Straight Bill of
Lading . . . .

(*Id.*) The Bills of Lading also assured that, "[s]hipper hereby certifies that he is familiar with all

the terms and conditions of said bill of lading," and that "these terms and conditions of sale shall

exclusively govern the purchase and sale of the goods . . . ." (*Id.*)

The Bills of Lading, however, were only agreements between American Foods and J&W

Transport, and were signed by representatives of each company. The Bills of Lading were never signed by either of the Buyers or even seen by them. The Buyers never contractually agreed to shifting the risk of loss to the Buyers when American Foods delivered the goods to American Foods' own carrier. In fact, the price American Foods charged the Buyers was the price of goods delivered to the Buyers, as American Foods hired and paid the carrier, J&W Transport.

### 4. Accident

On November 15, 2006 at approximately 1:45 a.m., J&W Transport's tractor-trailer was involved in a one-vehicle accident around U.S. 42 in Union County, Ohio. The accident occurred after J&W Transport picked up the load of meat from American Foods, and before it was delivered to the Buyers. Flandrich testified that he swerved to avoid some deer, and his tractor-trailer overturned on the side of the road and slid approximately 100 feet on its side.

When the meat left American Foods, the temperature inside the Thermo Unit containing the meat was listed at 28 degrees. About 45 minutes after the accident, Flandrich shut off the Thermo Unit. About two hours after the accident, Flandrich checked the temperature of the Thermo Unit, which registered approximately 30 degrees. According to Flandrich, at that time, the structural "integrity of the trailer was still all entirely intact." (Flandrich dep. at p. 41). The Ohio State Highway Patrol ("OHP") arrived on the scene and took photographs of the scene and the damage to the tractor-trailer.

The Union County Sheriff's Department called Kevin Holt ("Holt") dba Kevin's Towing to the scene to tow the tractor-trailer. Holt arrived at the scene about 45 minutes after the accident. Holt took videotape of the truck before attempting to upright it. He alleges there was a tear in the left front top corner, approximately a foot, which he videotaped. The hole was not big

enough for any of the packages of meat to come out of, but it was big enough for dirt to get in.

He testified regarding the structural integrity of the trailer:

> The entire left side of the trailer the structural integrity was compromised, because all the ribs that go from the bottom of the trailer to the top of the trailer were bent at a certain degree and the bottom of the trailer was the same shape of the drainage ditch, so the entire left side had been compromised, as well as the seam between the top of the trailer and the side of the trailer was split.

(Holt dep. at 46). Once cargo was removed from the trailer, Holt saw dirt inside.

To tow the trailer, Holt first needed to unload part of the meat onto a separate box truck. The seal to the doors of the trailer had to be broken to unload the meat. It took him several hours to off-load the cargo of meat onto his box truck, which was not refrigerated. By the time he began trying to upright the trailer at around 7:00 a.m., the Thermo Unit had been turned off for about five hours. Holt hooked up the trailer, and on his first attempt to raise it, the front end of the wrecker lifted about five feet in the air, but he was unable to move the trailer. He then set everything back down and repositioned. There was no damage caused by the towing wrecker to the trailer at that point.

After rehooking to get a different angle, Holt began trying to lift the trailer again. It came about three feet off the ground, then the main support of the trailer on the roof where the strap went across snapped, which caused the trailer's side to split from top to bottom. According to Flandrich, this was "the first time that there had been any violation of the structural integrity of the trailer." (Flandrich dep. at 64). The OHP took photographs of the damage to the trailer after it was split.

Two hours later, a second towing service, Rusty's Towing, arrived at the scene and loaded the cargo of meat onto a reefer trailer. Rusty's Towing eventually removed the truck,

trailer, and remaining cargo from the scene, and took it to its lot. Rusty's Towing would not release the meat without payment of its towing/salvage bill. Flandrich, his insurer (OOIDA), and Kevin's Towing could not agree on responsibility for paying the bill to Rusty's Towing or what to do with the meat. Consequently, the trailer and the meat sat at Rusty's Towing. American Foods was not given the opportunity to access the meat until after it was completely spoiled.

Both Buyers had set dates and times for the delivery of cargo to arrive. Due to the accident, Flandrich could not meet the deadlines. Even if the trailer had been uprighted on the first attempt, by the time Flandrich obtained another tractor to pull it, the meat would have been several hours late. Flandrich alleges in his deposition testimony that the Buyers would not have accepted the cargo of meat if it was over an hour late.

Because the cargo was never delivered to the Buyers, American Foods was never paid by the Buyers for the value of the cargo. Pursuant to its cargo insurance policy with Great West, American Foods presented a cargo damage claim in the amount of $31,813.85 to Great West. Great West paid American Foods this amount. These damages break down as $700.00 for cargo movement (after the meat was ruined, it needed to be removed from the tow lot); $29,539.09 for cargo damage, and $1,754.76 for various disposal costs. American Foods gave written notice of this claim to Flandrich, but he never paid the claim.

### 5. OOIDA Coverage

At the time of the accident, Flandrich had a Commercial Inland Marine Motor Truck Cargo Liability policy issued by OOIDA that covered "loss or damage to cargo . . . caused by . . . overturning of the truck." (Motor Truck Cargo Broad Form). However, such loss was only covered if the loss to the cargo occurred while the cargo was in Flandrich's "care, custody or

control." (*Id.*) The maximum cargo limit of liability was $150,000, subject to a cargo deductible of $1,000 and a refrigeration breakdown deductible of $2,500. (*Id.*)

Immediately after the accident, Flandrich contacted a representative of OOIDA to file a claim. He alleges he informed OOIDA that the cargo of meat was lost at the moment the tractor-trailer hit the ditch. After notifying OOIDA of his claim, Flandrich alleges he was assured by representatives of OOIDA that they would take care of his claim and the situation. Flandrich asserts that he continuously contacted and/or followed up with OOIDA on the status of his claim and their handling of the cargo of meat. After OOIDA received notice of the accident, they assigned Flandrich's claim to an adjustor, Interstate Casualty Claim Service ("ICCS").

On November 30, 2006, Flandrich contacted the claims agent for OOIDA who he alleges informed him they were not sure what they were going to do. Flandrich asserts he then informed OOIDA that there were two dog food companies less than 20 minutes from the storage facility that would purchase the cargo of beef at 50 cents on the dollar. OOIDA did not follow up on this lead, however, or attempt to resell the meat. The cargo of meat was not disposed of until Rusty's Towing contacted the USDA, approximately 60 days later. Subsequently, the cargo of meat was hauled to Sharonville and disposed of.

On January 10, 2007, Flandrich was informed by OOIDA that coverage on the loss of the cargo of meat was being denied. The reasons given by OOIDA were that no physical loss or damage occurred to the cargo while it was in his care, custody, or control. Rather, the damage occurred to Flandrich's load when Kevin's Towing took care, custody, and control of his trailer and negligently attempted to upright it. Furthermore, OOIDA alleged, the damage to the cargo was the result of the trailer being split by Kevin's Towing, not the result of the overturning of the

truck.

## B. PROCEDURAL BACKGROUND

On October 3, 2007, Great West commenced suit against Flandrich, dba J&W Transport, alleging causes of action pursuant to 49 U.S.C.A. § 14706, et seq. (the "Carmack Amendment"), breach of contract, negligence, and subrogation. In addition, Great West sued Kevin's Towing, alleging negligence and subrogation causes of action. In response, Flandrich filed a cross-claim against Kevin's Towing, seeking contribution and/or indemnification as to Great West's claims, if any, against Flandrich. Further, Flandrich filed a Third-Party Complaint against OOIDA for breach of duty, bad faith, and breach of an insurance contract. This matter is now before the Court on Great West's, Flandrich's, and OOIDA's Motions for Summary Judgment.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rest upon its mere allegations." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must

present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. LAW AND ANALYSIS

### A. GREAT WEST'S CLAIMS AGAINST FLANDRICH

Great West has moved for partial summary judgment against Flandrich on its Carmack Amendment claim and breach of contract claim and attorney's fees claim. Great West is subrogated to the rights of its insured, American Foods, due to its payment pursuant to its insurance policy. *See, e.g., N.W. Mut. Ins. Co. v. Jackson Vibrators, Inc.,* 402 F.2d 37, 40 (6th Cir. 1968); *Shealy v. Campbell*, 485 N.E.2d 701, 703 (Ohio 1985). Therefore, whether Flandrich is liable to American Foods determines whether Great West can recover from Flandrich.

### 1. Carmack Amendment Claim

The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 14706, et seq., makes common carriers liable "for any loss or damage" caused by such carriers to property received by them for transportation. *See, e.g., Plough, Inc. v. The Mason and Dixon Lines*, 630 F.2d 468, 470 (6th Cir. 1980).

### a. Standing

Flandrich asserts that Great West is not entitled to summary judgment because it does not have standing to bring a Carmack Amendment claim. The Amendment requires that a carrier transporting property issue a bill of lading to the shipper, and makes the carrier liable to the one entitled to recover under the bill of lading for loss of or injury to the property. *Am. Road Serv. Co. v. Consol. Rail Corp.,* 348 F.3d 565, 568 (6th Cir. 2003).

In this case, Great West's form bills were used. Flandrich asserts that Great West is not

entitled to recover under the Bills of Lading because it did not have title or an insurable interest in the cargo of meat at the time of the accident. The basis for Flandrich's argument is that the form Bills of Lading state, "Buyer assumes all risk of loss upon Seller's delivery of the goods to the carrier at the Shipping Point and Seller shall have no further responsibility for the goods." (Bills of Lading at p. 2). Accordingly, Flandrich argues that Great West had no interest in the meat at the time of the accident because title to the meat passed to the Buyers, along with the risk of loss, at the time Flandrich received the meat.

A bill of lading is "the basic transportation contract between the shipper-consignor and the carrier." *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982); *see also The Carlos Roses*, 177 U.S. 655, 665 (1900) ("[b]ills of lading stand as the substitute and representative of the goods described therein"). The purpose of the Carmack Amendment is to provide a remedy, "where ***a shipper*** whose cargo is lost or damaged by ***a carrier*** may recover damages for that loss." *Glass v. Crimmins Transfer Co.,* 299 F.Supp.2d 878, 884 (C.D. Ill. 2004) (emphasis added). American Foods was the shipper whose cargo was lost, and Flandrich was the carrier. The Bills of Lading were issued to American Foods as representative of the cargo of meat for which Flandrich was entrusted. Hence, American Foods had title to the cargo of meat at the time of the accident, and this was an insurable interest. American Foods is entitled to recover under the Bills of Lading for loss of the cargo of meat due to the actions of Flandrich, the carrier.

Furthermore, it is a fundamental rule of contracts that a contract cannot bind a party who has not accepted the contract. *Hamilton Foundry & Mach. Co. v. Int'l Molders & Foundry Workers Union of N. Am.,* 193 F.2d 209, 215 (6th Cir.1952). A buyer is not a party to the bills of

lading and is not bound by their terms unless it contracts to be so. *Stein Hall & Co., Inc. v. S.S. Concordia Viking*, 494 F.2d 287, 291 (2d Cir. 1974) (cited by *Datas Indus. Ltd. v. OEC Freight (HK), Ltd.*, No. 98 Civ. 6904, 2000 WL 1597843, at *5 (S.D.N.Y. Oct. 25, 2000)); *ITT Rayonier, Inc. v. S.E. Mar; Co.,* 620 F.2d 512, 514 (5th Cir. 1980); *see U.S. v. Waterman S.S. Corp.*, 471 F.2d 186, 188 (5th Cir. 1973) (declining to find government liability when the "government was neither party nor privy to the bill of lading"). A carrier and shipper "cannot contract to bind an unconsenting party." *Stein*, 494 F.2d at 291.

A party "cannot unilaterally employ definitions to bind another by provisions to which the other has not consented to be bound." *Waterman*, 471 F.2d at 189 n.4. In *APL Co. Pte. Ltd. v. U.K Aerosols Ltd., Inc.*, 452 F.Supp.2d 939 (N.D. Cal. 2006), the carrier tried to assert that a third party (who was not the shipper) was liable to it because the third party was a "merchant" within the meaning of the bill of lading, and the carrier asserted that an unnamed party in a bill of lading can still be bound under the bill's definitions. *Id.* at 944. However, the court held that the ability to bind an unnamed party is still subject to the "acceptance" requirement, and there had been no acceptance. *Id.* at 944-45.

Similarly, in this case, Flandrich has presented no evidence that either Kroger or Meijer accepted the terms of the Bills of Lading or even saw the Bills of Lading. Only Flandrich and American Foods signed those Bills, and neither were agents of the Buyers or could bind them in any way. There is no evidence that there was any agreement between American Foods and Buyers that the "risk of loss" would pass to Buyers upon delivery to Flandrich, who was a carrier hired by American Foods. In fact, the price American Foods charged the Buyers was the price of goods delivered to the Buyers, as American Foods hired and paid Flandrich. Buyers would not

be responsible for damages to a load which they did not receive and for which they did not arrange transportation.[1] There is no evidence that either Buyer had ever entered into such a contract with American Foods in any of their numerous dealings.

Furthermore, nowhere in the Bills of Lading is either Kroger's or Meijer's name mentioned. The only name in the Bills of Lading is a generic contract term of "Buyer." As stated in *Waterman* and *APL*, this definitional term cannot bind a party that has not agreed to be bound by the contract. Neither Buyer was a party to the Bills of Lading. As such, neither Buyer can be liable under such Bills, and neither Buyer can bring a claim for recovery under such Bills. The sole interest holder is American Foods, as the shipper, whose rights are subrogated to Great West. Therefore, Great West has standing to bring a claim under the Carmack Amendment.

### b. Liability

The Supreme Court has construed the Carmack Amendment as follows:

> [T]he statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods.

*Missouri Pacific R. R. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964) (citations omitted). The Court dealt with the burden of proof in such cases as follows:

---

[1]American Foods explained that the terms on the bills were designed for situations where the buyer provides for the transport of the goods at issue, by either picking up the goods on its own or hiring its own carrier. This is referred to by American Foods as "CPU" or "Customer pick up." This construction is sound, as the buyer is taking responsibility for transportation of the goods at issue, it should also take responsibility for the risk of the loss incurred in the transportation. However, while the form bills of lading used by American Foods may have been designed for CPU situations, that was not the arrangement in this case. Instead, American Foods, the seller, arranged for transport of the meat.

> Accordingly, under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability.

*Id.* at 138 (citations omitted).

First, to establish its prima facie case, Great West must show delivery of the meat in good condition to the carrier. There is no dispute that the meat was delivered to Flandrich in good condition. Flandrich admitted this in his deposition and it is attested to by the Bills of Lading Flandrich signed. Specifically, he testified that he was "absolutely positive" that he inspected the trailer's temperature before he signed the load's Bills of Lading, and further, that he had "no reason to believe the goods were damaged" when they were transferred into his possession by American Foods. (Flandrich dep. at 112, 113).

In the second element of the prima facie case, Great West must show that the meat arrived in damaged condition. Again, there is no dispute that the meat was damaged while Flandrich transported it. The meat never even arrived to its destination. Flandrich also testified that based on his past experience, the Buyers would not have accepted the meat, given that the meat was involved in an accident, and as such would need to pass USDA inspection prior to it being sold for human consumption. (Flandrich dep. at 111-12, 221).

Finally, to establish its prima facie case, Great West must show the amount of damages. There is no issue of material fact as to the amount of damages, as Great West was damaged in the amount of $31,813.85. Because American Foods has retained $1,000 from J&W Transport, Great West does not seek such $1,000 pursuant to summary judgment, and its damages therefore constitute $30,813.85. Therefore, there is no genuine issue of material fact about any of the

Carmack Amendment's three prima facie elements. Great West has established a prima facie case.

The burden of proof then shifts to Flandrich to show both that he was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability. Not one of the statutory defenses is available. There was no "act of God," act of "the public enemy," or act of a "public authority." Nor was the meat ruined by any "act of the shipper," or due to "any inherent vice or nature of the goods." Flandrich cannot meet his burden. Accordingly, the Court **GRANTS** Great West's Motion for Summary Judgment on its Carmack Amendment claim.

### 2. Breach of Contract Claim

The Carmack Amendment preempts all state law to the contrary. *See Adams Express Co. v. Croninger*, 226 U.S. 491, 507 (1913), cited by *Arctic Exp., Inc. v. Del Monte Fresh Produce NA, Inc.*, 366 B.R. 786, 793 (S.D. Ohio 2007). The doctrine of complete preemption eliminates state law claims against carriers and preserves uniform treatment of the carrier-shipper relationship. *Automated Window Mach., Inc. v. McKay Ins. Agency, Inc.*, 320 F.Supp.2d 619, 620 (N.D. Ohio 2004). State law causes of action for breach of contract are preempted by the Carmack Amendment. *Id.* Thus, Great West's Motion for Summary Judgment on the breach of contract claim, due to failing to deliver the cargo and causing damage to the cargo, is **DENIED** due to preemption.

### 3. Attorney's Fees Request

Great West asserts that pursuant to the Transportation Agreement between American Foods and J&W Transport, Great West is entitled to attorney's fees incurred in this matter. The

Transportation Agreement states:

> Carrier shall indemnify and hold [American Foods] harmless from and against any and all loss, damage, cost, expense, including reasonable attorney's fees, which may be incurred by [American Foods] or any person, persons, firm, association or corporation resulting from acts, or omissions, negligent or otherwise of Carrier or its employees, in performing or failing to perform the transportation services specified hereunder, including the . . . transportation . . . of the freight . . . .

(Transportation Agreement § 8). Whether attorney's fees are allowed under a Carmack Amendment claim appears to be an issue of first impression in this Circuit. And, the law arising out of the other federal courts is conflicting and unclear. *Compare Rini v. United Van Lines, Inc.*, 104 F.3d 502, 505 (1st Cir. 1997) (finding attorney's fees are not allowed under a Carmack Amendment claim if the fees awarded are pursuant to a state statute), *with Mosso v. Dependable Auto Shippers, Inc.*, No. 1:07-cv-00005-OWW-NEW, 2007 WL 2746723, at *6 (E.D. Cal. Sept. 19, 2007) (finding attorney's fees are allowed under a Carmack Amendment claim if the fees awarded are pursuant to a provision in the bill of lading).

Because the Carmack Amendment does not specifically provide for the shipper's recovery of attorney's fees (except in the case of "household goods"), a claim for attorney's fees is based on statutory law or common law. In this case, the claim is based on common law, arising out of a private contractual agreement.

A party cannot recover attorneys fees for succeeding on a Carmack Claim under a state statute. *See, e.g., Rini*, 104 F.3d at 505; *Accura Sys , Inc. v. Watkins Motor Lines, Inc.*, 98 F.3d 874, 876 (5th Cir. 1996). Nevertheless, some courts have held that the Carmack Amendment "[does] not prevent the parties from contractually providing for attorney's fees to the prevailing party in a Carmack Amendment dispute." *See, e.g., Mosso,* 2007 WL 2746723, at *6;

*OneBeacon Ins. Co. v. Haas Ind., Inc.*, No. C07-3540 BZ, 2008 WL 4291506, at *1 (N.D. Cal. Sept. 18, 2008).

In *Mosso*, the bill of lading provided, "the prevailing party shall be entitled to payment by the losing party of all attorneys' fees . . . " 2007 WL 2746723, at *4. Similarly, in *OneBeacon*, the bill of lading provided that if a party successfully defended itself of any legal action, that party, "shall be entitled to reasonable attorneys fees and costs." 2008 WL 4291506, at *1. And in *Knight Transp., Inc., v. Westinghouse Digital Elecs., LLC*, No. 3:07-CV-1210-D, 2008 WL 194739 (N.D. Tex. Jan. 22, 2008), the court recognized that parties, in their bill of lading, can contract around the system of federal regulatory "default rules" that the Carmack Amendment established, to provide for attorney's fees (though they failed to do so in that case). *Id.* at *1.

Even if this Court agreed with *Mosso*, *OneBeacon*, and *Knight* that parties can contractually provide for attorney's fees in a Carmack Amendment dispute, this case differs significantly from those cases. First, the attorney's fees provision in this case is based on the Transportation Agreement, not the Bills of Lading. There is nothing in the Bills of Lading that entitles American Foods to attorney's fees. There is no case law precedent that a contract other than the bill of lading can be used to award attorney's fees in a Carmack Amendment dispute; therefore, this Court will not recognize such an expansion.

Second, the attorney's fees provision in the Transportation Agreement provides fees for any loss or damage to cargo, even if the carrier is not found to be responsible under the Carmack Amendment. Specifically, it provides that J&W Transport shall indemnify American Foods for reasonable attorney's fees incurred from acts of J&W Transport in failing to perform the

transportation services. (Transportation Agreement at § 8). This attorney's fees provision is not based on any determination of success on a claim or prevailing party status. Therefore, it directly contradicts the Carmack Amendment, in that it would allow an award of attorney's fees even if, for example, the damage to the cargo was caused by an act of God and there was no negligence on the part of the carrier. As already stated, it is undisputed that the Carmack Amendment preempts all contradictory state law.[2] And furthermore, this would lead to the strange result that American Foods could lose their Carmack Amendment claim, and have their breach of contract claim preempted, but still be entitled to recover attorney's fees. For the foregoing reasons, Great West's request for attorney's fees is **DENIED**.

### B. FLANDRICH'S CLAIMS AGAINST OOIDA

Flandrich has moved for summary judgment against OOIDA on the coverage claim and bad faith claim. OOIDA has moved for summary judgment against Flandrich on the coverage claim and breach of duty to defend claim.

### 1. Coverage Claim

The parties do not dispute that Georgia law applies to the insurance contract coverage claim as the policies were made and payment was remitted in Georgia. In Georgia, insurance policies are governed by ordinary rules of contract construction. *Chicago Title Ins. Co. v. Citizens & S. Nat'l Bank*, 821 F. Supp. 1492, 1494 (N.D. Ga. 1993). The construction of a contract is a question of law for the court; however, where any matter of fact is involved, such matter is for the jury. Ga. Code Ann. §§ 13-2-1.

---

[2]If an attorney's fees provision provided fees to a party prevailing on a Carmack Amendment claim, such a provision would be providing a remedy not set out in the Carmack Amendment, but it would not necessarily be in direct contradiction.

It is undisputed that Flandrich had a Commercial Inland Marine Motor Truck Cargo Liability policy issued by OOIDA (the "Cargo Policy") in full force and effect at the time of the accident. OOIDA denies that the Cargo Policy covered the damage or loss to the cargo of meat for two reasons. First, OOIDA asserts that any loss or damage to the cargo did not occur, as required in the basic coverage, while such cargo was in Flandrich's care, custody, or control. Second, OOIDA asserts that any loss or damage to the cargo falls under Exclusion #5, which states as follows, "Loss or damage caused by spoilage, contamination, deterioration, freezing, rusting, electrical and/or mechanical failure, and/or damage to refrigerated and/or temperature controlled cargo [is not covered]." (*Id.*) This exclusion has an exemption for liability for loss or damage "caused by or resulting from . . . overturning of the truck." (*Id.*) Nevertheless, OOIDA asserts this exemption does not apply.

Therefore, in order for OOIDA to deny coverage to Flandrich, it must be determined either that: (1) Flandrich is not entitled to basic coverage because the cargo of meat was not in his care, custody, or control at the time the loss or damage to the cargo occurred; or (2) even if Flandrich's claim falls within basic coverage, coverage is excluded under Exclusion #5 of the policy and the exemption to Exclusion #5 is inapplicable.

### a. Care, Custody, or Control

OOIDA asserts that the cargo of meat was in the care, custody, or control of Kevin's Towing, and not Flandrich, at the time the physical loss or damage to the cargo occurred. In its denial of coverage letter to Flandrich, OOIDA stated:

> [T]he information provided to this office reveals no physical loss or damage occurred to your load of hamburger while the hamburger was in your care, custody or control. Rather, the physical loss and/or damage that occurred to your load of hamburger occurred when Kevin's Towing took care, custody and control

of your truck and trailer and negligently attempted to upright them. Thus no
coverage can be afforded on this loss.

(Denial Letter at p. 2).

Under Georgia law, the insured, has the initial burden of proving that its loss was covered under the terms of the policy. *Essex Ins. Co. v. H & H Land Dev. Corp*., 525 F.Supp.2d 1344, 1346 (M.D. Ga. 2007). Where the non-moving party bears the burden of proof, the moving party has the initial burden to demonstrate that "there is an absence of evidence to support the essential elements of [the non-moving party's claims] claims." *Id.* (*citing Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). Where the moving party bears the burden of proof, it must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Id.* (*citing Irby v. Bittick,* 44 F.33 949, 953 (11th Cir. 1995).

The parties debate whether the cargo was in Flandrich's care, custody, or control when Holt attempted to upright the trailer. On one hand, Flandrich was at the scene the entire time Holt attempted to upright the trailer. (Flandrich dep. at 81). And, Holt testified that if at any time Flandrich would have asked him to stop what he was doing, he would have stopped. (Holt dep. at 100). On the other hand, Flandrich admitted that he gave Holt his permission to attempt to upright the trailer, did not participate in any of the steps that Holt undertook to upright the trailer, and did not give Holt any direction or instructions regarding the specific manner in which he should go about the work he was doing. (Flandrich dep. at 82-83).

The terms "Care," "Custody," and "Control" are undefined in the Cargo Policy. These terms are terms of art whose meaning varies depending on the underlying type of risk being insured. *Tifton Mach. Works, Inc. v. Colony Ins. Co.,* 480 S.E.2d 37, 39 (Ga. App. Ct. 1996).

-19-

According to Black's Law Dictionary (8th ed. 2004), "Care" means: "Serious attention; heed." "Custody" means, "The care and control of a thing or person for inspection, preservation, or security." *Id.* And "Control" means, "The power or authority to manage, direct, or oversee." *Id.*

From the facts alleged, it is unclear whether Flandrich was paying "serious attention" to the cargo and whether he had "power or authority to manage, direct, or oversee" the cargo. Thus, if the damage or loss to the cargo occurred when Holt attempted to upright the trailer, there is a genuine issue of material fact as to whether Flandrich had care, custody, or control, and it is for a jury to decide if such damage or loss is covered under the Cargo Policy.

It is undisputed, however, that Flandrich was operating the truck when it was overturned. As such, the cargo was in his care, custody, and control at that point. If the damage or loss to the cargo occurred when the truck was overturned, Flandrich is entitled to basic coverage.

### i. Evidentiary Issues

Before analyzing the evidence surrounding whether the cargo was lost or damaged when the truck was overturned, this Court must first address OOIDA's two challenges to the admission of affidavit statements of Holt and Hutchisson.

### (a.)Affidavit Statements Inconsistent with Deposition

OOIDA asserts that portions of Holt's affidavit cannot be used as evidence to support that the cargo was lost or destroyed when the truck was overturned. OOIDA reasons that Holt's affidavit directly contradicts his previous deposition testimony.

A party cannot create a genuine issue of material fact by filing an affidavit that essentially contradicts his earlier deposition testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). A party who was not directly questioned about an issue, however,

will not be prevented from "supplementing incomplete deposition testimony with a sworn affidavit." *Id.* at 907. That affidavit "fills a gap" and thus "provides the district court with more information, rather than less, at the crucial summary judgment stage." *Id.* It is not the deponent's obligation to volunteer information not fairly sought by the questionnaire. *Id.* The court must determine whether the affidavit "directly contradicts" the party's prior sworn statement. *Id.* at 908. If there is no "direct contradiction" the court "should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue." *Id.* The existence of a sham fact issue turns on:

> whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.

*Id.* at 909.

During Holt's deposition, he was questioned about the condition in which he found the meat upon arriving at the scene of the accident. Holt's testimony is as follows:

> Q.    Did you get a chance to view the meat?
> A.    I had an awful lot of it in my hands. I saw quite a bit of it. . . .
> Q.    You didn't inspect every package either, did you?
> A.    Of course.
> Q.    You don't know if it was good or not, do you?
> A.    No.
> Q.    You don't have any expertise in the meat industry.
> A.    I'm not an inspector.
> Q.    You eat meat.
> A.    That's about as close as I get.
> Q.    You wouldn't have looked at each package to see if there was a little rip in the plastic or perforation?
> A.    Correct

(Holt dep. at 128). The portions of Holt's affidavit that OOIDA seeks to have stricken are:

> 5.    The trailer had been loaded with beef, and when the accident occurred, the

beef had been tossed about inside the trailer and intermixed with the dirt and other debris. It could no longer be sold at retail as apparently it was intended.

6.      Both the trailer and its contents were heavily damaged, if not completely destroyed, in the accident before I was dispatched to the scene.

The Court does not find that these affidavit provisions "directly contradict" Holt's deposition. In his deposition, he was questioned on whether he inspected every package, which he answered he did not. He was also questioned on whether he knew if the meat was "good or not," which he answered he did not. This second question was vague. He could have interpreted it to mean whether he knew if the meat was spoiled by the accident due to a rise in temperature or debris getting inside the packaging. Or, he could have interpreted this to mean whether he knew if the meat was ever in good condition in the first place (i.e., whether the meat had left American Foods in good condition).

In his affidavit, Holt states that the meat was tossed about inside the trailer and intermixed with dirt and debris. That testimony does not "directly contradict" the above deposition statements and is consistent with his deposition statements that he could see dirt inside the trailer once the cargo was removed. (Holt dep. at 45 and 47-48). In his affidavit, Holt also states that the beef could no longer be sold at retail as it was intended, and that the beef was heavily damaged, if not completely destroyed, in the accident. This also does not "directly contradict" the above deposition statements and is consistent with his deposition statement that for food cargo which had to be temperature controlled, after it is in an accident, "under general circumstances it is not worth saving." (*Id*. at 39). It also is consistent with his deposition statement that whenever there is a cargo of food involved in an accident "it's generally trashed." (*Id.* at 111). Finally, its consistent with his deposition statement that he has had experience with

accidents involving a cargo of food dozens and dozens of times and, "[a]s soon as food product is involved in an accident, it's compromised for sanitary reasons." (*Id.* at 111-12).

Therefore, this Court finds OOIDA's assertion that Holt's affidavit is inconsistent with his deposition testimony to be without merit, and thereby **DENIES** OOIDA's Motion to Strike on that basis.

*(b.) Expert Opinion*

OOIDA also asserts that portions of Holt's and Hutchisson's affidavits cannot be used to show that the meat was so heavily damaged that it could not be sold at retail. OOIDA reasons that Holt's and Hutchisson's opinions regarding the condition of the meat should be disregarded because they are not experts in retail meat markets. Federal Rule of Civil Procedure 56(e)(1) states:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and *show that the affiant is competent to testify on the matters stated* . . . .  The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

(emphasis added).

In their affidavits, Holt and Hutchisson opined that the condition of the meat after the crash was such that it "could no longer be sold at retail as apparently it was intended" and was "heavily damaged, if not completely destroyed." (Holt aff. at ¶¶ 5-6; Hutchisson aff. at ¶¶ 5-6). OOIDA asserts that to establish whether Holt and Hutchisson were competent to testify as to whether any retailer would have accepted the meat, they must be established as experts, "with knowledge of the relevant standards governing whether a retailer will accept meat that has been involved in an accident. (Response of OOIDA at p. 5). Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The question therefore is: does a person have to be an expert in the retail meat industry, as OOIDA asserts, in order to give the opinion that the meat could no longer be sold at retail and the opinion that the meat was heavily damaged?

This Court finds that these opinions are based on specialized knowledge and education acquired by experts in the retail meat industry. These are not issues germane to the towing industry. And though Holt and Hutchisson can testify, based on their observations and personal experiences, how overturned food products were treated in the past, they cannot opine in this case that the meat was damaged and not fit for human consumption.

> Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is ***whether the expert's knowledge*** of the subject matter is such that his opinion ***will likely assist the trier of fact in arriving at the truth.***

*Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir.1981) (emphasis added). Holt and Hutchisson do not have **knowledge** about the retail meat industry such that they could give an opinion that would assist the Court in determining the condition of the meat.

Accordingly, this Court finds OOIDA's assertion that portions of Holt's and Hutchisson's affidavits should be disregarded because they are not experts in retail meat markets to be meritorious. This Court **GRANTS** OOIDA's Motion to Strike from paragraph five in both affidavits the statement: "It could not longer be sold as apparently it was intended," and the Motion to Strike from paragraph six in both affidavits the statement: "Both the trailer and its

contents were heavily damaged, if not completely destroyed, in the accident before I was dispatched to the scene."

### ii. Analysis of Evidence

OOIDA argues that the cargo was not lost or damaged when the truck was overturned because the temperature of the Thermo Unit was not rising, so the meat was staying cold, and there were no breaks in the perimeter of the trailer, so no dirt or other debris had gotten inside the trailer and mixed with the meat. OOIDA asserts that only after the trailer was split by Holt's unsuccessful attempt to upright it was the cargo damaged because it was exposed to the elements.

Flandrich counters that the cargo of meat was destroyed due to the overturning of the truck, the inability to make the delivery on time, and the breaking of the seal on the trailer prior to attempting to upright it.

### (a.) Temperature of Meat

The only evidence provided as to the temperature of the meat inside the trailer is the testimony of Flandrich, who checked the temperature about two hours after the accident, which was about an hour after he turned off the Thermo Unit. At that time, the temperature read 30 degrees. According to the Bills of Lading, when the meat had left American Foods, the temperature was 28 degrees. The temperature had risen two degrees in the first hour the Thermo Unit was turned off. The temperature was not checked after this.

Before Holt could attempt to upright the trailer, he needed to unload about half of the meat onto a separate box truck, which was not temperature controlled. About three hours passed between the time Flandrich last checked the temperature and before Holt began trying to upright

the trailer. None of the meat was in a temperature controlled environment during this time. If the temperature of the meat continued to rise two degrees every hour the Thermo Unit was turned off, the meat could have risen to a temperature of 36 degrees by the time Holt attempted to upright the trailer. According to Flandrich, most buyers had a small degree of temperature variation in the meat they would allow and still accept the meat, which was between four and six degrees. OOIDA does not dispute this fact. It would have taken at least several additional hours to arrange for an alternate truck to come pick up the trailer. Thus, even if the trailer had been uprighted on Holt's first attempt, the temperature of the meat could have risen even more, far surpassing any four to six degree variance window. However, the meat also could have maintained its temperature as the accident occurred in November in the middle of the night. Therefore, there is a genuine issue of material fact about whether the meat was damaged or lost due to temperature variation caused by the overturning of the trailer.

*(b.) Structural Damage and Dirt Infiltration*

Flandrich testified at his deposition that he believed the trailer was intact after the accident; however, Flandrich admitted that it was hard to tell what the damage to the trailer was when it was lying on its side because he could not see the side on the ground. The Traffic Crash Report, deposition testimony of Flandrich, and eye-witness accounts of Holt and Hutchisson all affirm that the trailer sustained a considerable amount of damage upon hitting the ditch and sliding over 100 feet.

Holt testified that when he arrived on the scene, there was a tear in the left front top corner, approximately a foot. He took videotape of this tear. The hole was not big enough for any of the packages of meat to come out of, but it was big enough that dirt could have gotten in.

Also, he testified:

> The entire left side of the trailer the structural integrity was compromised, because all the ribs that go from the bottom of the trailer to the top of the trailer were bent at a certain degree and the bottom of the trailer was the same shape of the drainage ditch, so the entire left side had been compromised, as well as the seam between the top of the trailer and the side of the trailer was split.

(Holt dep. at 46). Once cargo was removed from the trailer, Holt could see dirt inside the trailer.

Nevertheless, OOIDA asserts that even if dirt was able to filter into the trailer and mix with the packages of meat, the shrink-wrap covering the meat would have prevented the dirt from penetrating inside and contaminating the meat. The packages were not inspected by anyone to see if there were any tears in the plastic. Therefore, there is a genuine issue of material fact as to whether the meat was damaged or lost due to the structural damage and dirt infiltration caused by the overturning of the trailer.

*(c.) Overturning of the Trailer*

Flandrich asserts the meat was lost due to the overturning of the trailer, regardless of whether the temperature rose or whether dirt mixed with the meat. Flandrich started the trucking business of J&W Transport six years ago. He has worked as an over-the-road truck driver for approximately 40 years. He has always owned his own trucking business. He has transported foods for American Foods for six years. Therefore, he is an experienced trucker who has particular familiarity with the transportation of food.

Flandrich testified at numerous points in his deposition that if the Buyers knew the trailer had been laid on its side, they would not accept it. As soon as the load hit the ditch, he testified that he knew it was going to have to go back to the American Foods plant. He also testified, "Irrespective of whether that trailer was breached, it was going to have to be inspected by the

USDA." (Flandrich dep. at 184). Though he had not personally laid over a load before, he had witnessed other truckers drive into the receiving dock with loads that had been dumped over, and he saw that the buyer refused to accept such loads. He had specifically seen Kroger refuse loads that had been laid over. He testified, "the minute they open the doors, the load is laying all over the whole inside of the trailer, they're not going to accept that. The load would have went right back to Sharonville." (*Id.* at 183-84).[3]

OOIDA argues that this evidence does not demonstrate that Kroger always rejects such cargo or that Kroger has a uniform policy that they will never accept meat that was carried in a trailer that had been overturned. OOIDA also argues that this does not establish that Kroger, or some other buyer, would not have accepted the meat in this case. Furthermore, Larry Hulford ("Hulford"), president and chief of Interstate Casualty Claims Service, Inc., performed an investigation for OOIDA after the accident. Based on Hufford's conversations with the owner of Rusty's Towing and several brokers of distressed cargo, his inspection of the meat itself, the Crash Report, and the OHP photos, Hufford concluded the cargo was not damaged or lost before Holt attempted to upright it. Hufford has experience in making determinations regarding the condition of cargo following an investigation.

In order to create a conclusion by circumstantial evidence, the evidence must be such that a reasonable juror would draw the conclusion from the circumstances proved. *Cuna Mut. Ins. Soc. v. Turner*, 225 S.E.2d 765, 766 (Ga. App. Ct. 1976). This evidence establishes that Kroger

---

[3]The Thermo Unit regulated the temperature in the trailer and kept a computer record of the temperature inside the truck at all time. However, Flandrich had turned off the Thermo Unit, so there was no evidence for a buyer that the meat had been maintained at the correct temperature. It is questionable whether any buyer could accept meat where there was no record of the temperature that the meat had been maintained at.

has in the past refused cargo because it was overturned in an accident, and from this evidence, a reasonable juror could draw the conclusion that Kroger would take this same course of action in the future, and thereby would not have accepted the meat. Flandrich's experience with Kroger also allows a reasonable juror to conclude that other buyers in the retail meat industry, such as Meijer, would also reject such a load. In addition, Holt's previous observations of overturned loads of food being rejected also allows a reasonable juror to conclude that this load was destroyed when it was overturned. However, a reasonable juror could also conclude that Kroger, Meijer, or some other buyer would have accepted the meat, because there is no evidence that they actually rejected the meat in this case or had an official policy of rejecting overturned meat. In addition, Hulford's conclusion from his investigation provides further evidence that the meat was not damaged or lost until the trailer was split. Therefore, there is a genuine issue of material fact as to whether the damage or loss of meat was due to overturning of the trailer.

*(d.) Failing to Meet Delivery Time*

Flandrich also asserts the Buyers would have rejected the meat because it would not have arrived on time. The Buyers had set specific times for delivery that Flandrich could not meet due to the accident. By the time Holt began his attempt to upright the trailer, it was already thirty minutes past the deadline for delivery to Kroger and approaching the deadline for delivery to Meijer. And, it still would have taken Flandrich a few hours to secure a new tractor to pull the trailer even if the trailer had been uprighted on the first attempt. Once Flandrich got the tractor, he would have to make arrangements to get the tractor out to a site where he could hook it onto the trailer. Furthermore, Flandrich testified that the load was going to have to be inspected again by the USDA, which would further delay the time. (Flandrich dep. at 184).

Flandrich testified that Kroger does not accept loads that are over an hour late. However, Flandrich could not testify that he has personally seen a load rejected for this reason or evidence that this was their official policy. Flandrich also could not testify that Kroger would not have accepted the meat late once the situation was explained to them and alternative arrangements were made. In fact, he testified that alternative arrangements for later delivery had been made in the past due to inclement weather. In addition, Flandrich could not testify that Meijer had such a policy, or that other buyers would not have accepted the meat. Without any evidence that Meijer or other buyers would have rejected the meat, and without any evidence that Kroger would not have agreed to a later delivery due to the circumstances, a reasonable juror could not conclude that the cargo was damaged or destroyed due to failure to meet the delivery time.

*(e.) Breaking of Seal*

Finally, Flandrich asserts the Buyers would have rejected the meat because the seal to the trailer had been opened and approximately one-half of the cargo was off-loaded prior to Holt even attempting to upright and load the tractor-trailer.

Before Flandrich left American Foods with the cargo of meat, they sealed the trailer with a metal seal, and the seal had a number that was noted on the paperwork. Flandrich testified that when he would get to Kroger's distribution center, he would go to the guard shack and the guard would come out and check the seal on the trailer and note on the paperwork that the seal was still intact. Then he testified that he would go to the receiving dock and they would break open the seal and check that the number on the seal matched the number written by American Foods. This would insure that the cargo of meat had not been tampered with since leaving American Foods.

Flandrich has not put forth any evidence that Buyers would not have accepted the cargo

once the seal was broken and cargo was off-loaded, as he could not testify to observing or experiencing this himself, and he has no evidence that Kroger or any other buyer has a policy of rejecting meat when the seal is broken and cargo is off-loaded.[4] Therefore, Flandrich has not shown that the cargo was damaged or lost due to the breaking of the seal.

In conclusion, there is a genuine issue of material fact as to whether the cargo was damaged or lost due directly to the overturning of the trailer, or due to a rise in temperature or structural damage and dirt infiltration caused by overturning of the trailer. Even if the damage or loss was not due to overturning of the trailer, but was due to Holt attempting to upright the trailer, there is a genuine issue of material fact about whether the cargo was in Flandrich's care, custody, or control at that time. Therefore, it is for a jury to decide whether Flandrich was entitled to basic coverage.

### b. Exclusion #5 and Its Exception

OOIDA asserts that even if this Court finds that loss or damage to the cargo occurred while the cargo was in Flandrich's care, custody, or control, Flandrich should be denied coverage because Exclusion #5 applies, which excludes the following from coverage:

> [l]oss or damage caused by spoilage, contamination, deterioration, freezing, rusting, electrical and/or mechanical failure, and/or damage to refrigerated and/or temperature controlled cargo.

All exclusions from coverage sought to be invoked must be strictly construed and insurance contracts are to be read in accordance with the reasonable expectations of the insured, where possible. *Richards v. Hanover Ins. Co.*, 299 S.E.2d 561, 564 (Ga. 1983). OOIDA bears the

---

[4]Whether the cargo that was off-loaded would have been rejected due to the rise in temperature is a separate matter addressed earlier in this Order. This section, however, merely addresses whether the cargo would have been rejected because the seal was broken and meat was off-loaded.

burden of proof and persuasion to show that the exclusion, if any, applies. *Reliance Ins. Co. v. Walker County*, 431 S.E.2d 700, 702 (Ga. App. Ct. 1993).

There is an exception to Exclusion #5, which states that loss or damage falling under Exclusion #5 is covered if such loss or damage is "caused by or resulting from . . . overturning of the truck." The burden of proof as to whether an exemption to the exclusion applies lies with the party claiming the exemption. *Jarrard v. Clarendon Nat'l Ins. Co.*, 600 S.E.2d 689, 690 (Ga. App. Ct. 2004).

If the loss or damage occurred while the cargo was in Flandrich's care, custody, or control, whether Exclusion #5 operates to exclude coverage depends on whether the loss or damage resulted from the truck overturning. If the loss or damage occurred when Holt attempted to upright the trailer, then Exclusion #5 would exclude coverage. If, however, the loss or damage occurred either because the truck overturned, or because the truck overturning resulted in a rise in temperature or structural damage and dirt infiltration, then the exception to Exclusion #5 would prevent exclusion of coverage. Accordingly, there is a genuine issue of material fact as to whether Exclusion #5 operates to exclude coverage, which depends on a jury's determination as to when the loss or damage to the trailer occurred.

For the foregoing reasons, Flandrich's Motion for Summary Judgment on the coverage claim is **DENIED**, and OOIDA's Motion for Summary Judgment on the coverage claim is **DENIED**.

## 2. Breach of Duty to Defend Claim

Flandrich alleges that OOIDA breached its duty to defend him, set forth in the Cargo Policy, by failing to defend Flandrich in the suit brought by Rusty's Towing in the case of *Rusty's*

*Towing Service Inc. v. Kevin Holt. et al.* in the Ohio Court of Common Pleas, and by failing to

defend Flandrich in this case. The Cargo Policy states:

> [i]f legal proceedings be taken to enforce a claim against the Insured as respects
> any such loss or damage, Insurers reserve ***the right at their option***, without
> expense to the Insured, to conduct and control the defense on behalf of and in the
> name of the Insured.

(Cargo Policy at p. 5, emphasis added). OOIDA asserts that this provision does not impose upon

OOIDA a duty to defend, but rather "the right at [its] option" to defend Flandrich in the event of

an action against him for loss or damage covered under the policy.

Flandrich argues that this policy provision is ambiguous. He argues this provision may be

interpreted to mean that OOIDA may provide a defense to Flandrich, but in the event they choose

not to do so, Flandrich will not incur any expenses in defending himself. In other words,

Flandrich asserts that the provision may be read to mean that OOIDA must cover Flandrich's

expense in providing his own defense to dispute claims that should be covered under the policy.

All ambiguities in insurance contracts must be construed against the insurer to provide

maximum coverage to the insured. *Chicago Title*, 821 F.Supp. at 1495. Genuine ambiguities arise

"[w]henever the phrasing of an insurance policy is so confusing that an average person could not

make out the boundaries of the coverage." *Isdoll v. Schottsdale Ins. Co.*, 466 S.E.2d 48, 50 (Ga.

App. 1995), cited by *York Ins. Co. v. Williams Seafood of Albany, Inc.*, 223 F.3d 1253, 1255 (11th

Cir. 2000)  (if "an insurance policy is confusing to a layman, the policy is ambiguous"). This

Court does not find this provision to be confusing as it unambiguously gives the insurer the right,

but not the duty, to defend claims on behalf of the insured. *See E. Florida Hauling, Inc. v.

Lexington Ins. Co.,* 913 So.2d 673, 677 (Fla. App. Ct. 2005) (interpreting similar contractual

language as unambiguous); *Ohio Cas. Ins. Co. v. Carman Cartage Co., Inc.*, 636 N.W.2d 862,

867 (Neb. 2001) (same). This language merely means that if OOIDA decides to conduct the defense, Flandrich does not have to pay for the defense OOIDA has decided to conduct.

Flandrich also argues that this provision renders the insurance policy illusory.

[A] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory.

*Century 21 Am. Landmark, Inc. v. McIntyre*, 427 N.E.2d 534, 536-37 (Ohio App. Ct. 1980). Flandrich asserts that the right to defend at OOIDA's sole option and discretion is a hollow promise as OOIDA would never elect to exercise its option to defend Flandrich because there is no benefit to OOIDA. Flandrich asserts this would mean that Flandrich would remit premium payments for a promise that OOIDA would never have any obligation to fulfill.

This Court has found no case law which has held that a provision similar to the above was illusory. Rather, several courts in various jurisdiction have construed language similar to the above as providing the insurance carrier the right, but not the duty, to provide a defense to its insured, and these courts have enforced this language. *Cincinnati Ins. Co. v. Sierra Rock and Dirt, Inc.*, No. 05-5094-KES, 2007 WL 690134, at *4 (W.D. S. Dak. Mar. 2, 2007); *E. Florida Hauling*, 913 So.2d at 677; *Ohio Cas.*, 636 N.W.2d at 867; *Centennial Ins. Co. v. Transitall Serv., Inc.*, No. 00C1383, 2001 WL 289879, at *3 (N.D. Ill. Mar. 15, 2001); *B&D Appraisals v. Guadette Mach. Movers, Inc.*, 752 F.Supp. 554, 556 (Dist. R.I. 1990). This Court finds that the language in the Cargo Policy is not illusory and is enforceable.

Flandrich's final argument is that his Motor Carrier Liability Policy ("Motor Policy") states OOIDA has the "duty and the right" to defend any lawsuit. However, the Cargo Policy (which is the Commercial Inland Marine Motor Truck Cargo Liability Policy) is the policy that is

applicable in this case because the damage at issue is to the cargo, not the truck or trailer. The Cargo Policy only creates a right to defend, not a duty.

Nevertheless, Flandrich argues that the following language in the Motor Policy incorporates the Cargo Policy:

> These declarations and the common declarations together with the common policy conditions, coverage form(s) and endorsements, if any, issued to form a part thereof, complete this policy.

This Court does not agree. The above language simply means that the Motor Carrier Coverage Form Declaration, the Motor Carrier Coverage Form, the Motor Carrier Coverage Conditions, as well as the endorsements attached to the Motor Policy, comprise one policy: the Motor Policy. On the other hand, the Cargo Policy, including its forms, conditions, and endorsements, comprise a separate policy: the Cargo Policy. Nowhere does the Motor Policy incorporate the terms of the Cargo Policy, or vice versa.

Although the Cargo Policy grants OOIDA the right to defend Flandrich in a lawsuit over loss to cargo, there is no duty imposed upon OOIDA to defend Flandrich. As such, Summary Judgment for OOIDA is **GRANTED** on the breach of the duty to defend claim.

### 3. Bad Faith Claim

Flandrich alleges that OOIDA acted in bad faith by refusing to pay policy benefits to Flandrich for loss or damage to the cargo of meat without reasonable justification. Initially after the accident, Flandrich contacted Commercial Truck Claims Management ("CTCM"), the claims management arm of OOIDA, to report the accident. Later that morning, Flandrich contacted OOIDA to inform them that he had reported the accident to CTCM. CTCM assigned Interstate Casualty Claims Service, Inc. ("ICCS"), an independent insurance adjustment company, to

investigate and to adjust the cargo loss arising out of the subject accident.[5]

The day after the accident, Flandrich spoke with the claims agent, Travis Emley ("Emley"), for OOIDA about the accident. Flandrich alleges that at that time, he informed Emley that the cargo was lost when the trailer overturned. Further, Flandrich informed OOIDA that there was cargo being refrigerated in a trailer sitting at Rusty's Towing. Flandrich alleges that OOIDA assured Flandrich that they would take care of the issue and get back to him; however, OOIDA did not do so. Flandrich alleges he called OOIDA every day for seven days straight trying to get an answer, but got nowhere.

Flandrich charges that the investigation performed by ICCS on behalf of OOIDA was grossly inadequate. Flandrich further asserts that OOIDA and/or ICCS's investigation regarding Flandrich's claim for coverage for the cargo of meat did not uncover evidence to support a finding that the cargo of meat was not in Flandrich's care, custody, or control at the time the loss or damaged occurred. Flandrich asserts the investigation shows that OOIDA did not interview any witnesses, including Flandrich, who had first-hand knowledge of the accident scene. Further, Flandrich contends that the investigation shows that OOIDA intentionally sought a reason to deny Flandrich coverage.

OOIDA argues that throughout the course of its adjustment activities relating to the subject cargo loss, ICCS undertook several steps in its investigation, which ICCS, in turn, reported to CTCM. According to Hulford, president and chief of ICCS, these steps included:

(a) An inspection of the recovered meat stored in a reefer trailer at Rusty's Towing, conducted on the day after the accident;

---

[5] ICCS performs independent insurance adjustment activities for several insurance companies and entities, including CTCM.

(b) Discussions with Ernie McQuirt ("McQuirt") of Rusty's Towing regarding the cause of the cargo loss;[6]

(c) Discussions with James Campbell of American Foods and several brokers of distressed cargo regarding the meat damaged during Holt's recovery efforts; and

(d) Obtaining the Ohio Highway Patrol ("OHP") Traffic Crash Report and OHP photographs of the trailer taken before and after Holt's efforts to upright the trailer.

Therefore, OOIDA asserts it performed an adequate investigation.[7]

The law imposes upon the insurer a duty to act in good faith in the handling and payment of the claims of its insured, and a breach of this duty gives rise to a cause of action in tort against the insurer. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1316 (Ohio 1983). The standard for analyzing a bad faith claim is set forth in *Zoppo v. Homestead Co.*, 644 N.E.2d 397 (Ohio 1994). In *Zoppo*, the Supreme Court of Ohio held that "[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Id.* at 397. An insurer lacks reasonable justification when it denies the claim in an arbitrary or capricious manner. *Hoskins*, 452 N.E.2d at 1320.

Even if Flandrich was entitled to coverage under the Cargo Policy, which is for a jury to

---

[6]Flandrich makes the claim that portions of Hulford's affidavit relating to discussions with McQuirt are inadmissable hearsay and should not be given weight in determining the issue of bad faith. (Flandrich Reply at p. 6). It is true that any statements by McQuirt regarding the actions of Holt and cause of the cargo loss could be inadmissable hearsay if offered for the truth of the matter asserted. However, any statements are merely being offered to show what McQuirt told Hulford, which he relied upon in forming his conclusion that the cargo was not lost or damaged. It is entirely irrelevant whether McQuirt's statements were true. All that matters is that they were said to Hulford, and Hulford relied on them. Consequently, those statements are not hearsay under Fed. R. Evid. 801.

[7]OOIDA cannot rely on information learned from deposition testimony taken subsequent to its denial of coverage to support that it did not act in bad faith. Any information OOIDA learned from deposition testimony did not impact its decision to deny coverage.

decide, Flandrich has presented no evidence of bad faith because OOIDA had a reasonable justification for denying the claim. OOIDA asserts that the evidence shows that OOIDA began to investigate immediately upon learning of the subject accident. On the very same day of the accidence, CTCM made the assignment to ICCS to investigate the cargo loss. The day after the accident, Hufford of ICCS traveled to Rusty's Towing Company and inspected the recovered meat.[8]

OOIDA asserts that Hufford spoke with several individuals regarding the accident. Specifically, he questioned McQuirt of Rusty's Towing regarding the cause of the cargo loss.[9] McQuirt informed Hufford that Holt had attempted to upright the trailer and that this caused the trailer to split and to spill the cargo out into the elements. Hufford also interviewed James Campbell of American Foods as well as several brokers of distressed cargo regarding the subject cargo, and inspected the cargo the day after the accident.[10] OOIDA maintains that Hufford was diligent in speaking with individuals who may have had information about the subject accident and the loss to the cargo.

Hufford did not interview the OHP patrolman who arrived at the scene, but he did review the OHP Traffic Crash Report and the OHP photographs of the trailer and then forwarded these materials to CTCM. The Traffic Crash Report contains the patrolman's version of the events and

---

[8]However, there is no evidence in the record that Hufford learned anything relevant as to the cause of the accident or as to whether the meat was lost or destroyed from his inspection. In fact, there is no evidence as to *anything* he learned from his inspection.

[9]McQuirt was not at the scene when the accident occurred, before Holt began his attempt to upright the trailer, or when the trailer split.

[10]However, there is no evidence in the record that Hufford learned anything relevant as to the cause of the accident or as to whether the meat was lost or destroyed from these conversations. In fact, there is no evidence as to *anything* he learned from these conversations.

what he had witnessed at the scene of the accident. As such, OOIDA asserts it was not necessary for Hufford to interview the patrolman. Hufford also alleges that the OHP photographs, some of which were taken before Holt attempted to upright the trailer and some of which were taken after the trailer was split, revealed that the trailer was intact before Holt attempted to upright it.

Based on Hufford's conversations, his inspection of the meat itself, the Crash Report, and the OHP photos, Hufford reported to CTCM that there was no evidence that the cargo was damaged or lost before Holt improperly attempted to upright it. OOIDA then denied coverage on this basis. OOIDA asserts that based on this evidence, it was reasonably justified in denying Flandrich's claim.

Flandrich argues that OOIDA was not reasonably justified in denying his claim because it failed to perform an adequate investigation before denying his claim. In *Zoppo*, the court held that performing a cursory investigation and ignoring information that would tend to support the insured's claim can constitute bad faith. 644 N.E.2d at 400. In that case, the basis for denial of the claim was that the insured himself had set the fire that destroyed his business. *Id.* In investigating the claim, the insurer failed to locate certain key suspects, verify alibis, investigate threats and prior attempts to set fire to the business, follow up with witnesses, or look into the insured's alibi that he was out of state on the morning of the fire. *Id.* "In fact, evidence was presented that when interviewing some of the alleged perpetrators, the investigators did little more than ask cursory questions such as whether they were responsible for the fire." *Id.* Thus, the matter was insufficiently investigated by the insurer which led to the basis on which the claim was ultimately denied. *Id.*

Flandrich argues that like *Zoppo*, OOIDA failed to interview key parties, investigate

and/or verify facts, or follow up with witnesses, and OOIDA ignored evidence which would tend to support Flandrich's claim that the cargo was lost or destroyed when the truck overturned. OOIDA did not interview Holt, Hutchisson, any of the police officers, or Flandrich, all of whom were at the accident scene following the accident and saw the trailer before and after Holt attempted to upright it. Flandrich argues that had OOIDA interviewed Flandrich and Holt, they would have informed OOIDA that the load was lost when the trailer overturned. Flandrich also argues that had OOIDA interviewed a representative from the Buyers, OOIDA would have received information that not only was the cargo not going to make it to the Buyers on time, but the Buyers would have never accepted the cargo.

Flandrich asserts that an email from Hufford to the claims adjuster for OOIDA sent November 28, 2006 reveals that OOIDA did not perform a through investigation. In the email, Hufford wrote "BINGO!" and provided a reason for OOIDA to deny the claim. The primary basis for the denial was the narrative report in the Traffic Crash Report from the OHP patrolman, citing the trailer being dropped by Kevin's Towing. The email stated that the OHP patrolman would be a good witness; however, by OOIDA's own admission, that officer was never interviewed. Flandrich asserts this email serves as further proof that OOIDA did not perform an adequate investigation and the "BINGO!" language shows that OOIDA was just looking for an excuse to deny coverage. Flandrich argues that OOIDA put forth a "hollow shell of an investigation," to ensure that it would not uncover evidence that would support Flandrich's claim.

This Court finds that though Hufford's interview with McQuirt and the Traffic Crash Report could provide some justification for denial of the claim, OOIDA is only reasonably justified in denying the claim if it performed an adequate investigation. It cannot merely conduct

a cursory investigation and fail to interview key witnesses and look into key facts in order to prevent uncovering evidence that would support coverage. It is unclear from the record whether OOIDA adequately investigated to find out whether the cargo was in Flandrich's care, custody, or control of Flandrich when it was lost or damaged, or whether OOIDA just looked for a reason to deny the claim.[11] Because there are material issues of fact as to whether OOIDA performed an adequate investigation of Flandrich's claim, it is for a jury to decide whether OOIDA was reasonably justified in denying Flandrich's claim. Therefore, Flandrich's Motion for Summary Judgment on the bad faith claim is **DENIED**.

## V. CONCLUSION

For the foregoing reasons, this Court: (1) **GRANTS** Great West's Motion for Summary Judgment against Flandrich on the Carmack Amendment claim, but **DENIES** Great West's Motion for Summary Judgment against Flandrich on the breach of contract claim and request for attorney's fees; (2) **DENIES** Flandrich's Motion for Summary Judgment against Great West on the Carmack Amendment claim; (3) **DENIES** Flandrich's Motion for Summary Judgment against OOIDA on the coverage claim; (4) **DENIES** OOIDA's Motion for Summary Judgment against Flandrich on the coverage claim, but **GRANTS** OOIDA's Motion for Summary Judgment against Flandrich on the breach of duty to defend claim; and (5) **DENIES** Flandrich's Motion for Summary Judgment against OOIDA on the bad faith claim.

---

[11]For instance, OOIDA did not interview anyone who had first hand knowledge of events that transpired at the time of the accident or at the time the trailer split. Neither McQuirt nor Campbell could speak to whether the cargo was lost or damaged before Holt arrived on the scene. OOIDA did not investigate whether the Thermo Unit had been broken in the accident, which would have caused a rise of temperature of the meat. In addition, OOIDA did not investigate whether Flandrich even relinquished control to Holt to upright the trailer, as Flandrich could have been directing that process, thereby exercising control at all times.

**IT IS SO ORDERED.**

                                        **s/Algenon L. Marbley**
                                     **ALGENON L. MARBLEY**
                                     **UNITED STATES DISTRICT JUDGE**

**DATED: March 31, 2009**